Carutiiers, J.,
delivered the opinion of the Court.
This bill was filed on the 3d day of May, 1852“, in the Chancery Court at Rutledge, for an account of the estate of Jenkin Whitesides, of whom Thomas Whitesides, the testator of the defendant, Turley, was the administrator.
Jenkin Whitesides died a citizen of Davidson county, in August, 1822, unmarried and without lawful issue. His brother, Thomas, was appointed his administrator on the 22d of October, 1823, and entered into bond with his brothers, William and David, his sureties in the penal sum of $15,000.00, for the faithful performance of his duties. Thomas Whitesides died in 1851.
*169 On the 23d day of February, 1820, Jenkin White-sides sold to Thomas his “Bean’s Station” property, at $25,000, and gave him a bond for title of that date. The payment of $4,500.00 of the consideration was provided to be made in property, notes in bank, &c., at short day; and for the sum of $20,500, notes were agreed to be executed during the next June, seventeen in number, and each for one seventeenth, the first to be made payable in the ensuing July, and one at the termination of every six months after that time. It does not appear whether these notes were ever given, or that any part of the sum for which they were to be given was ever paid.
The bill claims this amount, with interest, as a debit against the defendant, upon the ground that it has never been in any way accounted for. It is also charged, that he made large amounts by speculating in the lands of the estate, by fraudulently permitting them to be sold for the debts of the deceased, to which he should have applied the amount in his hands as aforesaid, and other assets which might have or did come into his hands, by the collection of debts due the estate, rents of lands, town lots, &c. He is likewise charged with large losses, by neglect in making others account to the estate, who were indebted as partners, joint speculators, and otherwise, and inattention and unfaithfulness generally, to the duties enjoined upon him by law. A general account is asked by the complainants, charging the defendant with all moneys received, or which might have been collected by due • diligence, with credits for all proper disbursements.
The defence is rested entirely upon limitations and *170 lapse of time, with the resulting presumptions of payment and dischai'ge.
It was twenty-seven years from the time allowed to settle up the estate before the institution of this suit. There is certainly no limitation, by statute, in the way. The very laborious and ingenious argument on this subject has been considered with that respect which its ability and the earnestness with which it was pressed, demanded of us. But if we were convinced of the soundness of the positions as sumed, which we are not, it has been so long and so uniformly held, in this State, that the statute of limitations does not bar claims for legacies and distributive shares, that we would not feel authorized to establish a different construction, and unsettle the law upon that subject. It would be unnecessary now to enter into the discussion of the grounds upon which these decisions have been made. It is enough to say that the law is so settled, and we do not feel authorized now to disturb it. Whether there be a concurrent remedy at law, or an administrator or executor be an express trustee, or only a trustee by implication, are all questions which it would now be a use-Isss consumption of time to consider. Let these questions be as they may, our Courts have repeatedly and unvaryingly held, that an administrator cannot rely upon any statute of limitations, either general or special, as a bar to a claim for a distributive share of an estate in his hands.—Pinkerton vs. Walker, 3 Hay., 222; McDonald vs. McDonald, 8 Yerg., 145; Smart and Wife vs. Waterhouse, 10 Yerg., 94; Guthrie vs. Owen, Id. 339; Hayne vs. Hall’s Executors, et al., *171 5 Humph., 290. In North Carolina, upon the same statutes, the rulings have been the same.—1 Dev. Eq., 416; 2 Dev. & Bat. Eq., 219; 5 Ired., 350. These cases so fully and conclusively settle the question against the bar of the statutes of limitation, that it would be against all propriety, and the most palpable violation of the doctrine of stare decisis, now to hold otherwise. The evils of capricious and fluctuating decisions have been often commented upon by this Court.—9 Yerg., 427; 2 Humph., 163-166; 10 Yerg., 368, 445; and the importance of abiding by and adhering to adjudicated cases, as precedents, is everywhere recognized. This rule should only be departed from under the clearest conviction that former decisions were wrong, and not then, even, unless the injury arising from the instability of rules of right would be manifestly counter-balanced by the greater approximation to correctness to be attained by the change. There are certainly some cases where it would be the duty of the Court to reconsider and revise former adjudications. They are pointed out in Barton vs. Shall, Peck’s R., 231-2; 8 Yerg., 179, 184, and other cases. When such cases arise, the Courts should always be ready to set the law right, by reversing former decisions, and settling the law correctly. But we do not regard this as one of the questions calling for a correction of former adjudications. Consequently, we hold, that the defendant’s testator, as administrator, was an express trustee, in whose favor the statutes of limitation do not run.
“ Express trusts are those created by the direct and positive acts of the parties, by some writing, deed or *172 will.” Story’s Eq., § 980; or by the action of a court in the exercise of its authority to appoint executors and administrators. This extension of the definition of Story is authorized by the foregoing decisions. Ang. on Lim., 163, § 3. But the trusts in such cases, are declared by bond taken by the Court, for faithful performance, in addition to the order of appointment. “ This, says Angelí, is the most common mode of creating a trust not cognizable by law, and they are simply and technically trustees.” Id., 163.
For this case, it is not necessary to consider whether the definition might not be still further enlarged so as to cover other cases. Neither is it necessary, in view of the facts of this case, to examine the question of the application of the statute to cases of express trusts, where the trustee attempts to denude himself of that character, by a denial ■ of the trust, with the knowledge of those for whom he acts; nor if that were so, how far the concealment of the cause of action — the estate in his hands — would arrest the running of the statute; as we regard Thomas Whitesides an express trustee, and accountable as such, up to the time of his death.
This view of the case, it will be at once seen, renders it entirely unnecessary at present, to consider the argument urged with so much ability, on the subject of the effect of certain sections in the old acts of 1715 and 1762, if they should be considered now in force; as the object of that, part of the argument was to induce this Court to .reverse the decisions before cited, and apply the statutes of limitation in favor of administrators, upon the ground that they are *173 implied and not express trastees, or that the County Court had concurrent jurisdiction with the Courts of Chancery.
In the next place, with more apparent zeal and confidence, the presumptions arising from lapse of time are relied upon as an ample and complete defence. Upon this question there is much more difficulty. The Courts are, as they certainly should be, averse to the allowance of stale demands of any kind. The presumption of payment or satisfaction, is made by the law for the quiet and repose of society, and to prevent the great injustice which would often occur from loss of papers, death of witnesses, and the failure of memory. Upon this policy, certain periods have been fixed for the presumption of payment, or the existence and loss of all necessary papers, and even records and statutes that may be necessary for the protection of possession, and the safety and quiet of citizens. These principles are all well understood, and the doctrine of the books on the subject, every where acknowledged wise, and obligatory upon the Courts.— That the time in this case has been long enough to raise all necessary presumptions for the protection of the defendants and the defeat of the demands of the complainants, must be admitted by all, unless there be something in the situation and conduct of the defendants’ testator, or that of complainants’, to prevent the legal presumption; and this, it is insisted, is so in the case before us.
Jenkin Whitesides left a very large estate, but was extensively indebted, and much of his property encumbered. Doubts existed very soon after his death, as *174 to the solvency of his estate. He had made large investments in lands and town lots — had borrowed much money, and had, in many instances, secured his debts by mortgages and deeds of trust. Suits were pending against him at the time of his death, and many were brought against his administrator, and large judgments were rendered against him. The plea of “fully administered,” was found in his favor, and proceedings by scire facias against the heirs adopted, by which the realty was made liable, and much of it sacrificed. The finding of this plea in favor of the administrator, is relied upon on the one side, as a conclusive and binding adjudication upon the question, so far as to preclude any investigation now as to the existence of assets, and on the other, to show fraud and concealment on the part of the administrator, as it is insisted the plea was known by him to be false, because it is shown that the large debt of twenty thousand five hundred dollars, was then due from him, besides other means collected out of the effects. The brothers and sisters seemed careless and indifferent as to their interests, and confided every thing to the said Thomas Whitesides, in whose honesty and fidelity they seemed to repose implicit faith. It appears that he took charge and control of the real as well as the personal estate, and received the rents and profits by himself or agents, for many years. ' He has never made any settlement with the County Court, or returned an inventory of the property. He has at no time exhibited to those interested the state and condition of the estate., nor left any books,, papers or accounts explanatory of his transactions. The bond for *175 title to the “Bean’s Station” property was not registered until 1844, and it seems, was unknown to most of the heirs, nor is any account given of the large debt against himself, or the collections made by him, either of debts due the estate, or rents of the land. His intestate was one of the most distinguished lawyers of his day, and engaged in a large and highly lucrative practice, and would be presumed to have a considerable amount due him. It seems highly probable, too, that considerable amounts were due to him on account of some heavy joint operations in land, and other speculations with Balch, Bell and others, which might have been made available to the estate by a diligent and faithful attention to the business. It further appears that the idea was kept up by him that the estate was insolvent, and a settlement of his accounts protracted from year to year by the inexcusable negligence or guilty policy of the administrator. In 1833, and again in 1837, he said he would soon have the business in a condition to report, and settle up with the proper authorities, but failed to do so. The complainants were not well situated for concentrated action, or even consultation together. They lived a distance from each other, most of them poor, some intemperate, some under coverture, and others infants. None of the brothers or brothers-in-law seem to have had much energy or vigilance. The true condition of the estate was carefully concealed by the administrator, and all light on the subject withheld from the records, where, by his bond and his oath, he was bound, in the form of inventories and settlements, to exhibit, for the benefit of all concerned, full and clear infor *176 mation. It is highly probable that this suit never would have been brought if if had not been for the superior energy and business tact of the young Laf-ferty’s, two of the nephews, stimulated by an angry feud, which raged for some years between them and their uncle, before his death, in which, there was, of course, a loss of confidence on their part, which produced an investigation into the matters of his administration, and resulted in the filing of this bill, and the deyelopement of the facts as we have them before us.
Under all these circumstances is this a case where time will close the doors of a Court of equity, against the complainants ? Every case must be considered upon Its own circumstances with regard to the efFect of lapse of time. There is no arbitrary unyielding period fixed as in the limitation by statute. It is not a case where the bar is applied In analogy to the statute of limitations, for that is only the cáse where the courts of equity, exercise a concurrent jurisdiction with Courts of Law, but this is a case of express trust as has already been shown. Ang. on Lim. 163 § 3. In those cases cognizable exclusively in Courts of Equity, the bar depends upon the long established doctrine of those courts, that stale and antiquated demands, laches and negligence, will not be encouraged, and not upon any statute or analogy thereto. 1 Sto. Eq., § 529. 9 Pet. 415, In the case last cited, the Supreme Court of the U. S. adopting the language of Lord Clarenden in Smith vs. Cay, 3 Bro. Ch. Rep. 640, note, stated the doctrine to be, that “ a Court of Equity which is never active in relief against conscience, or public convenience has *177 always refused its aid to stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. Nothing can call forth this Court into activity, but conscience, good faith and reasonable diligence. Where these are wanting, the Court is passive and does nothing; laches and neglect are always discountenanced; and therefore, from the beginning of this jurisdiction there was always a limitation of suits in this Court.” Lord Redesdale, in 2 Sch. & Lef. 637-8, says this is the “ law of Courts of Equity.” Story, in the paragraph cited, says that “ This doctrine is founded on considerations of public policy, from the difficulty of doing entire justice, when the original transactions have become obscure by time and the evidence may be lost, and from the consciousness that the repose of titles and the security of property are mainly promoted by a full enforcement of the maxim, that the law assists the vigilant and not those who sleep on their rights.” The same section contains a qualification of the rule in these words : “ Under peculiar circumstances however, excusing or justifying the delay, Courts of Equity will not refuse their' aid, in furtherance of the rights of the party, since in such cases there is no pretence to insist upon laches or negligence as a ground for dismissal of the-suit.”
There is no .precise time fixed for this equitable bar, but our Courts have • most generally held twenty years to be the period within which equitable or-trust claims must be- enforced, and after that they will be regarded as too stale for favorable .consideration in a Court of Equity; in some cases a shorter *178 time has been held sufficient, and in others a much longer will not protect the trustee.
We are very well satisfied that in the case under consideration, the circumstances are such as to withhold from the defendant any advantage or protection from the lapse of time, except as to a general account. He has not so demeaned himself in his trust as to be entitled to this defence. In order to have secured for himself the shield which time affords, he should have complied in the management of his trust, with the conditions of his bond as administrator and the requirements' of the law, for the exposition of the condition of the estate. It is true, that without this the complainants could have filed their bill and brought him to account at any time after the expiration of two years from his appointment, notwithstanding his failure to return an inventory or make a settlement with the County Court; but it would be unjust to put them to disadvantage for failing to do so, as long as he was in default in a matter so material to the prosecution of their rights understandingly. There was no inventory to show the effects which came to his hands, nor any settlement nor even memorandum to which the distributees could refer to ascertain for how much if any thing they could sue. This circumstance of itself would perhaps be sufficient to preclude the defence of lapse of time. But in addition to this, he failed to give a true account of the value of the estate when he was appointed, as we must presume from the fact that there was a single debt against himself of more than twenty thousand dollars, independent of all others, and the slaves and much other per *179 sonal property, and he only entered into a bond in the penalty of fifteen thousand dollars, for the faithful performance of his trust. He also told a son of one of the brothers in 1834, and his brother David a few years after, that he hoped to 'be able to settle up in a very short time, and expected to save something for the heirs, and that he was working for them as well as himself. On the part of the complainants, it may be said as explanatory of their delay, that they were numerous, careless, separated by distance, some under disabilities, all entertaining unbounded confidence in their brother Thomas, and looking up to him as the head of the name since the death of the great lawyer Jenkin, not doubting but that he would bring light out of darkness, and do all things right in the end.
Under all these circumstances it would certainly be unprecedented to repel the complainants, because of the lapse of time. There is no place or time from which to raise any presumption of a settlement, payment, or loss of papers in favor of defendants’ testator. He never placed himself in a condition to create the presumption in his favor; the more especially where the matters in defence for delay on the part of complainants, above referred to, are taken into consideration. The case, then, must stand upon its merits, without regard to the statutes of limitations or lapse of time, so far as they are relied upon as a complete defence or bar to this suit. But still we cannot open the case for a general account after so long a delay and 1ihe death of the administrator. The transactions are too much obscured by time, *180 and the danger of injustice too great to enter into a strict and minute account. To this extent the laches of the complainants must be held to affect their claim.
We are fully satisfied, however, that no part of the $20,500, has ever been paid or in any manner accounted for, in the administration. For this sum, therefore, with interest from the time it was due, according to the contract set forth in the bond for title, a decree will be rendered against the defendant. True, the land itself cannot be reached, as the statute of limitations bars the vendor’s lien — 1 Sneed’s R. 193; but that does not affect the question of liability for the consideration as assets. He will also be charged with the amount of profits made by his testator on the tract of land in Bedford county, sold under a judgment in favor of Kirkman and others, against the administrator, and bought by him at $600. This judgment was for $8,000.00. The plea of fully administered was found for the administrator by consent, and the land made liable by scire facias against the heirs. It was bought by the administrator at the said sum of $600, and he obtained the Sheriff’s deed, by satisfying the sheriff that the judgment belonged to him without paying the amount of his bid. Near the date of his purchase, he sold about one half of the land for $8,000.00, and the defendant, as his executor, has sold the other half since his death under the will at about $12,000.00, showing a clear profit, besides rents for near a quarter of a century, of near twenty thousand dollars. Of this land he was a tenant in common with the complainants and should have saved *181 it, by the honest application of the funds in his hands, but caused it to be sold by the false and fraudulent finding of the plea of fully administered in his favor, and for these reasons cannot be allowed to speculate at their expense. Vide, Vanhorn vs. Fonda, 5 Johns. Ch. R. 407, 410, and 1 Wh. & T. Leading Cases. 56, 139, 145, as to the delay in filing the bill. This principle embraces administrators; id. 137, and tenants in common, 56. Besides this, there is much reaso.n to believe that whatever he may have paid was with the trust fund in his hands. It appears by his own letters to his brother Jenkin, soon after the purchase of the “ Bean’s Station” property in 1820, and by other evidence, that he was worth nothing outside of this property at the date of his administration. After that time his circumstances continued to improve, and he died worth near one hundred thousand dollars, without any extraordinary exertions or successful speculations. The circumstances make it clear that his fortune has resulted in some way from his connection with the estate of his brother. There is much reason to believe that by proper management, and the faithful discharge of his duties as representative of his brother, that the debts, heavy as they were, might have been all paid, and an immense estate saved, for the complainants. There was certainly never laid in the State a. better foundation for a very large fortune by the foresight and sagacity of any man of that day. But by the negligence, fraud and cupidity of the administrator, the estate was all wasted and the administrator as well as some others, in apparent confederation with him, had the good fortune of living and dying rich. But *182 so far as this particular transaction is concerned, it is tangible and the injury can be redressed. He will be held to have acted for the common benefit in the discharge of the land from the judgment which was ■levied upon it, and made to account accordingly.
In addition to his character of administrator and tenant in common, he was at the time, guardian for the Lafiertys, who were then infants. The case of Tisdale vs. Tisdale was decided at the last term at Jackson upon this principle. A reference will be made to the Master, to ascertain the amount for which the land has been sold, and for that amount with interest the defendant will be charged, after deducting the said sum of $600.00. But it is alleged that the whole judgment of $8,000.00, was paid out of the first sale of the. land, and that the same can be made to appear by proof. The Master will hear proof and report how that fact is, and the question whether the whole amount or only the $600.00, shall be deducted from the amount for which the land has been sold, is reserved until the coming in of the report.
The master will also report the amount of profits, made by the administrator on a house and lot in Nashville, mentioned in the pleadings and proof, sold under a deed of trust, given by his intestate, and bought, in by him. There is proof going to show other liabilities of the administrator for money received for debts and rents of land, and claims lost by negligence which might and should have been collected, as well as credits to which he is entitled for money paid out of the estate; but for the reasons before stated, these matters will not be opened for investigation, but *183 the relief will be confined to the three items above specified. All the costs will be paid by the defendant. Let a decree be entered accordingly.